MARY MAHLER, Admistratrix of John Mahler, deceased, Appellant, v. THE NORWICH AND NEW YORK TRANSPORTATION COMPANY, Respondent.

The statute, which gives a remedy for negligence resulting in death, has no extra-territorial force.

Long Island Sound is the subject of territorial dominion; being an inland arm of the sea, with no outlet to the ocean, except by a channel within cannon range on either side.

If the sound was not embraced in the royal grant to the Duke of York, the King retained it as the property of the crown, until it was divested by the revolution; and his dominion over its waters then devolved on the States of New York and Connecticut.

So far as these waters are wholly within this State, the territorial authority of New York, subject to the public right of navigation, extends from shore to shore; and so far as the two States are coterminous, it extends to the middle of the sound, if not to a line running directly from Fisher's Island to Lyon's Point.

The cession to the federal authorities of admiralty and maritime jurisdiction, over our inland seas and bays, was not an alienation of their waters, or of general jurisdiction over them; and in respect to these, the States retain unimpaired the residuary powers of legislation and their rights of territorial dominion.

The counties and towns which are bounded generally on the sound, comprehend within their limits, for the purposes of ordinary civil and criminal jurisdiction, the waters between their respective shores and the exterior water line of the State.

APPEAL from the Supreme Court. The action was for damages caused by the negligence of the defendant, and resulting in the death of the intestate.

On the trial at the Kings Circuit, it appeared that the deceased was on board of a sloop on Long Island Sound, on the 28th of October, 1853; that within a short distance of Sands' Point the sloop was sunk by a collision with a steamer of the defendant, caused by the negligence of those in charge of the steamer, and that the intestate was drowned.

The complaint was dismissed; the court holding, as matter of law, that the place at which the collision occurred was not within the jurisdiction of the State of New York. The judgment was affirmed at the General Term in the

second judicial district, and the plaintiff appealed to this court. The case is reported in 45 Barbour, 232.

*Wheeler H. Peckham*, for the appellant.

*James Emott*, for the respondent.

PORTER, J. The collision which resulted in the death of the intestate occurred about two miles east of Sands' Point, and within a mile of the Long Island shore. If the court below was right in holding that this portion of the sound is not within the limits of our jurisdiction, the complaint was properly dismissed, as the right of action rests upon a statute which has no extra-territorial force.

The islands in the sound, as well as those between it and the Atlantic, are confessedly within our limits. Fisher's Island, which is situate at its eastern extremity, is about two miles from the Connecticut shore. The opening, known as "The Race," between Little Gull Island and Fisher's Island, is the ship inlet to the sound from the ocean. (Blunt's Coast Pilot, 16th ed., 196.) Both these islands are in the State of New York. The distance between them is about four miles, which is also the width of the sound at the point where the collision occurred.

The question whether the injury to the intestate was committed within our jurisdiction, depends on the course of the New York boundary line from Fisher's Island to Lyon's Point. The court below held that this line must be so run as to exclude the waters of the sound below low water mark. The statute defining the boundaries of the State does not indicate the course of the line from Sandy Hook to Lyon's Point, otherwise than by declaring that it is to be run "in such manner as to include Staten Island and the islands of meadow on the west side thereof, Shooter's Island, Long Island, the Isle of Wight (now called Gardiner's Island), Fisher's Island, Shelter Island, Plumb Island, Robin's Island, Ram Island, the Gull Islands, and all the islands and waters in the bay of New York and within the bounds above described." (1 R. S., 65.)

It seems quite obvious that a direction, so to run the line as to include the islands within the bounds of the State, is not a direction so to run it as to exclude the intermediate waters. If New York was of right entitled to those waters, a renunciation of her title must be sought elsewhere, than in her assertion of right up to a line embracing the islands beyond them.

The description purports to define the exterior lines of a continuous territorial domain; and not to declare the respective boundaries of detached and separate tracts, divided from each other by the ocean, and connected only by the bonds of political union. Every intendment, therefore, is in favor of the natural, and obvious construction, that the lines indicated constitute a continuous boundary, at no point diverging from our possessions, to traverse either lands or waters which we do not own.

It is never to be assumed, except upon the clearest evidence, that a sovereign State intends, by its own legislation, to renounce a right of territorial domain, to which its title is clear and absolute. Such a relinquishment, in respect to one of the two great maritime avenues from New York city to the ocean, would be an abdication of rights, which we continue to assert in respect to the other, up to an ocean line stretching much farther from headland to headland; and which might well be open to question, if the doctrine could be admitted, on the basis of which it is claimed that we have renounced all dominion over the waters of Long Island Sound.

It would be an abandonment, by a maritime power, of jurisdiction over an inland body of water, inclosed within the State at each of its termini, and with no outlet to the ocean except under the command of our cannon from either shore. If such a surrender resulted from the adoption of the Revised Statutes, it had not even the merit of a voluntary cession to a sister State, or to the federal government, of the dominion we disclaim; but it amounted to a mere abandonment of a large portion of our internal domain to the indeterminate law of the ocean, without regard to the necessity of police regulation upon its waters, or the importance of

maintaining our jurisdiction, with a view to the protection of our commercial interests in peace, and to preparation, if occasion should arise, to repel aggression in case of civil or of foreign war.

As the injury in question occurred between our own shores, and west of the Connecticut boundary, it would be inappropriate in this case to determine the further question, whether the line should be run directly from Fisher's Island to Lyon's Point, as held by one of the former judges of this court, or whether it should follow the thread of the sound, with such deflections as may be required to include the islands confessedly within our jurisdiction.

That Long Island Sound was included within the territorial dominions of the British Empire, at the date of the charter from Charles the Second to the Duke of York, is a proposition too plain for argument. It was an inland arm of the sea, washing no shores but those of the provinces, and with no opening to the ocean, except by passing between British headlands less than five miles apart. The right of the King depended on none of the vexed questions involved in the claims of dominion, by the English over the waters of the Channel, by the Turks over those of the Black Sea, by the Venetians over those of the Adriatic, or the Romans over those of the Mediterranean. It rested on clear and fundamental principles of international law. The rule is one of universal recognition, that a bay, strait, sound or arm of the sea, lying wholly within the domain of a sovereign, and admitting no ingress from the ocean, except by a channel between contiguous headlands which he can command with his cannon on either side, is the subject of territorial dominion. (Wheaton's International Law, 320 ; Vattel's Law of Nations, 130 ; Hautefeuille Droits des Nations, 2d ed., 89 ; *Church* v. *Hubbard*, 2 Cranch, 187.) It is an immemorial rule of the common law, and has been asserted by the kings and courts of England from the earliest period of our ancestral history. (Halleck's International Law, 134, and the authorities there cited.) Within this rule, the islands at the eastern extremity of Long Island Sound are the *fauces terrae*, which define the

limits of territorial authority, and mark the line of separation between the open ocean and the inland sea. (*United States* v. *Grush*, 5 Mason, 290 ; Marten's Law of Nations, 171 ; Wheaton's id., 322 ; Vattel, 130.)

The right of the king to the waters of these inland seas and bays, and his authority to grant or withhold them in his royal charters, was settled by the Supreme Court of the United States in the case of *Martin* v. *Waddell.* (16 Peters, 367.) The question, whether the waters of the sound were embraced in the royal grant to the Duke of York, is one which we are not called upon to determine. If they were, they passed under the subsequent grants to the States of New York and Connecticut. If they were not, they remained in the king until his rights were divested by the revolution. The States contiguous to these, as to our other inland seas and bays, then succeeded to his dominion over their waters, and their property in them became absolute, subject to the public right of navigation. (*Martin* v. *Waddell,* 16 Peters, 367, 410 ; *Corfield* v. *Coryell,* 4 Washington C. C., 371, 385, 386.)

In the absence of any prior grant of the whole or any portion of these waters, each of the contiguous States succeeded to territorial dominion from its own shore to the middle of the sound, so far as their possession was coterminous ; the property of New York in the residue extending from shore to shore. Such is the settled rule applicable to neighboring States bounded by a territorial inland sea. (*Corfield* v. *Coryell,* 4 Washington C. C., 386; Wheaton's International Law, 320 ; Angell on Tide Waters, 7; 1 Azuni's Maritime Law, 225.) When the States succeeded to these rights of the king, as Judge Story observed, in a kindred case, where a bay was the boundary, "the law of nations must, under such circumstances, be presumed silently to prevail, and annex the bay, to the middle of the stream, to the territories of the adjacent provinces ; and as there was at all times a common right of passage and navigation, and it was necessary for the convenience of all parties, the whole waters must be deemed common for these purposes." (*The Schooner Fame,* 5 Mason, 147, 151.)

The State of New York has not relinquished to the federal government its territorial rights or its general jurisdiction over the waters of Long Island Sound. The Supreme Court of the United States has adjudged that the cession by the States to the federal authorities of admiralty and maritime jurisdiction over our inland seas and bays, was not a cession of the waters, or of general jurisdiction over them; and that the States retain unimpaired the residuary powers of legislation and their rights of territorial dominion. (*United States* v. *Beavan*, 3 Wheaton, 336.)

We entertain no doubt, therefore, that, to the extent we have indicated, the waters of Long Island Sound are within the jurisdiction of this State. We have chosen to consider the question as an open one, inasmuch as there has been some diversity of judicial opinion in regard to it. In the case of *The Sloop Elizabeth*, it was held by Judge LIVINGSTON, that the sound was not embraced in the charter to the Duke of York; and he held that this State had, therefore, no jurisdiction over its waters. He overlooked the unquestionable title afterward deduced through the revolution from the crown; and the decision is, therefore, entitled to no considerable force as an authority, though it has since been followed in a case reported in the Southern District of New York. (1 Paine's C. C., 10; Olcott's R., 18.)

In the case of *Jackalow*, who was indicted and tried in New Jersey for a robbery on the waters of the sound, Judge DICKERSON delivered an elaborate opinion, in which he held that the crime was not committed upon the " high seas; " that the sound was a mere arm of the sea, inclosed within *fauces terræ* at its eastern extremity, formed by headlands less than five miles apart; that it is the subject of territorial dominion; that this portion of the New York boundary, as declared in the Revised Statutes, is a line running directly through the waters of the sound from Fisher's Island to Lyon's Point; and that, as the offense was committed within the jurisdiction of New York, the prisoner could not be convicted of the crime in the State of New Jersey. The case afterward came before the Supreme Court of the United

States on a certificate of division of opinion; and it was there held, that the question whether the crime was committed in New York should have been passed upon by the jury. (1 Black, 484.) The court declined to determine the New York boundary, as matter of law; but the tendency of judicial opinion in that tribunal may, perhaps, be reasonably inferred from the fact, that the second trial before Judge GRIER resulted in the discharge of the prisoner, on the ground that the offense was committed within the jurisdiction of this State.

The question arose in this court some years since, in the case of *Manley* v. *The People* (3 Seld., 295). The prisoner had been convicted in the New York Sessions of an offense committed on a steamboat in Long Island Sound, opposite the Suffolk shore. It was held by the Court of Sessions, and by the Supreme Court: 1. That the crime was perpetrated within the limits of the county of Suffolk. 2. That as the theft occurred on the waters of the sound, and as the stolen property was brought to the city of New York by the prisoner, he was subject to indictment there, under a provision in the Revised Statutes applicable to offenses on lakes, rivers and canals. All the members of this court concurred in holding that the ruling on the last point was erroneous.

The question raised in the present case was discussed in the opinions delivered by two of the learned judges, who arrived at opposite conclusions. Judge WELLES was of opinion that the sound was not a mere arm of the sea, but constituted a portion of the open or "high seas;" that it was not, therefore, the subject of territorial dominion; and that the statutory description of our State boundaries should be so construed as to include the islands in the sound, and exclude its waters beyond low water mark. The court below, in the present case, thought this could be accomplished by running the line around Long Island, and from point to point opposite the respective islands, crossing the intermediate waters, running a boundary round each at low water mark, and returning by the same lines to the shore at the successive points of departure from our territory. Each line thus

traversed and retraversed between the shore and the islands would be one of mere divergence, inclosing nothing and forming no part of a continuous exterior boundary.

Judge EDMONDS was of opinion, with the Supreme Court, in that case, and with Judge DICKERSON, in the case of *Jackalow*, that the sound is an inland arm of the sea; and that its waters, up to a line running directly from Fisher's Island to Lyon's Point, the southwest corner of Connecticut, are within our territorial jurisdiction and within the bounds of the State as declared in the Revised Statutes. In regard to the particular course of the line from Fisher's Island to Lyon's Point, no other member of the court expressed either his concurrence or dissent; but five of the six judges who participated in the decision were of opinion that the sound is a mere arm of the sea; that the portion of its navigable waters opposite the Long Island shore is within our bounds as defined in the Revised Statutes; and that the crime in question was committed not only within the bounds of the State, but within the statutory limits of the county of Suffolk. The concurrence of a majority of the court in these views is decisive of the present appeal; and our own reëxamination of the question has led us to the same general conclusions.

We think there is no force in the suggestion, that, if the State owns to the center of the sound, a considerable part of our domain is not partitioned into counties and towns. Even if the statute, in declaring the bounds of the counties bordering on the sound, had limited them, in terms, to the line of low-water mark, it would indicate nothing but the mere fact that the legislature deemed their extension to the exterior water-line of the State a matter of no practical importance; but in the absence of any such limitation, we are clearly of the opinion expressed by this court on a former occasion, that the respective counties and towns, which are bounded generally on the sound, comprehend within their limits the waters between their respective shores and the water-line of the State. This is the usual and reasonable rule in the political apportionment of territory, for the purpose of fixing the limits of civil and criminal jurisdiction.

On the general question of the dominion of the State over the waters of Long Island Sound, we are fortified in our conclusion by the fact, that such jurisdiction has been constantly asserted by the political department of the government to which subjects of this nature appropriately belong. Laws have been enacted from time to time, as occasion has required, granting exclusive rights of ferriage across the sound; regulating its fisheries and navigation; directing the diversion of its waters, and the construction of new inlets into the Long Island ports; authorizing the projection of piers into its waters, and the collection of dockage and wharfage in its harbors; and empowering the commissioners of the land office to make grants, for like purposes, of lands under the waters of the sound, not extending five hundred feet below low-water mark, as well as lands between high and low-water mark. (Laws of 1853, ch. 83; Laws of 1865, ch. 642; Laws of 1849, ch. 435; Laws of 1839, ch. 173; Laws of 1855, ch. 556; Laws of 1847, ch. 409; Laws of 1858, ch. 261; Laws of 1835, ch. 234; id., ch. 232; 1 R. S., 3d ed., 233, §§ 81, 82, 85.)

The territorial jurisdiction of the State is disputed by no power, either foreign or domestic. Its title is clear under the decisions of our own tribunals, and equally clear under the rules of international law. We see no reason why it should not be upheld by the courts as firmly as it has been maintained by the State government.

Judgment should be reversed, and a new trial should be ordered.

Hunt, J., also read an opinion for reversal.

All the judges concurring, except Davies, Ch. J., who read a dissenting opinion,

Judgment reversed, and a new trial ordered.