## THE HUNGARIA.

### PINCKNEY v. THE HUNGARIA.

*(District Court, D. South Carolina.  November 23, 1889.)*

1. **ADMIRALTY—JURISDICTION—TERRITORIAL LIMITS—CIVIL PROCESS.**
   As the territorial limits of a federal court's jurisdiction in civil causes in admiralty are confined to the territorial limits of the judicial district, its civil process does not run to that frontier or belt of water recognized by the law of nations as under the control of the littoral owner, for purposes of revenue and defense.

2. **SAME—LIBEL IN REM—CONSTRUCTIVE JURISDICTION.**
   For the purposes of a libel *in rem*, a vessel cannot be considered to be constructively in port, within the court's jurisdiction, though it did not clear when it left port.

3. **SAME—JURISDICTION BY CONSENT—POWER OF MASTER.**
   When a vessel is outside the territorial limits of a court's civil process, the court cannot obtain jurisdiction of it, for the purposes of a libel *in rem*, by the consent or stipulation of the master.

In Admiralty.

Libel *in rem* by Charles C. Pinckney, Jr., against the British steamship Hungaria.

*I. N. Nathans*, for libelant.

*J. P. K. Bryan*, for respondent.

SIMONTON, J.  This is a libel *in rem*.  The steam-ship Hungaria came into the port of Charleston for a cargo of phosphate rock.  Owing to her draught, she took part of her cargo on board, and then crossed the bar and completed her loading from lighters.  For this purpose she anchored about a mile or a mile and a half south-east of the outer bar buoy, about four or four and one-half miles from the nearest shore.  This is the place at which vessels habitually anchor when they discharge or take in cargo by aid of lighters near this port.  She crossed the bar without clearing at the custom-house with the written permission of the collector, and was not finally cleared until 27th August last, at 11:20 A. M.  She never re-entered the port.  The libel was filed on 27th August, the ship being at her anchor at this place, outside of the bar.  Under the warrant of arrest, the marshal boarded and took possession of her at 11:30 A. M.  She was released on stipulation on 31st August, 1889.

An exception has been filed to the libel, that when the warrant of arrest was issued and served the ship was not within the territorial jurisdiction of this court.  The territorial limits of the state of South Carolina are the territorial limits of the judicial districts over which the district court of the United States for South Carolina has jurisdiction in civil causes in admiralty.  Rev. St. § 546; *In re Manufacturing Co.*, 108 U. S. 405, 2 Sup. Ct. Rep. 894.  Its civil process runs throughout the whole state, and is confined to its territory.  *Toland* v. *Sprague*, 12 Pet. 300.  The eastern boundary of the state of South Carolina, as fixed by her act of assembly, is the Atlantic ocean, including all the islands. Gen. St. S. C. § 1.

Was this ship, when at anchor at the place indicated, within the territorial limits of the state of South Carolina, and so within the judicial district of this court? This is a very narrow question. The arrest was made by the marshal of this court. Did he go outside of his bailiwick when he made it? If he did, the arrest was void.

The eastern boundary of the state being the Atlantic ocean, it must be ascertained in one of two methods: We must either take the line at high or low water mark, following the configuration of the coast so as to include the islands; or we must draw lines between the most prominent headlands, and treat these lines as the boundary. The general assembly, in its grant to the United States of land for the use of the jetties for Charleston bar, seemed to think that the high-water line was the boundary of exclusive state territory. Gen. St. § 33. The second method is the one adopted in New York. *Manley* v. *People*, 7 N. Y. 295; *Mahler* v. *Transportation Co.*, 35 N. Y. 352. If a line be run from the mouth of Little river, on the northern ocean boundary, to Cape Romain, the most prominent headland on the South Carolina coast, and another from Cape Romain to the mouth of the Savannah river, the southern ocean boundary, we will have the ocean boundary line of the state under this second method. The place of the ship on the day of her arrest, as estimated by the testimony of an expert with the use of the coast survey chart, was outside of this line. Not being *intra fauces*, she was not within the territory of the state. But it is urged that under the law of nations a portion of the sea adjacent to the shore is under the control of the littoral owner, and that the ship was within this limit. There are rights recognized by the laws of nations over the sea in the nation whose territory is upon it. The extent of these rights, that is to say, how much of the sea they cover, has been uncertain. Some nations claim a marine league; others more, even up to 30 leagues. Perhaps the best way of stating it is that every nation has the right to control so much of the seas adjacent to its shores as is necessary for all purposes of revenue or of defense. 1 Kent, Comm. 28; *Queen* v. *Keyn*, L. R. 2 Exch. Div. 81. What is the nature and extent of this control has been a disputed question. Is this belt of sea, under the control of the executive and legislative departments, used solely for purposes of revenue and defense, that is to say, for public purposes only, or is it within the boundaries of the judicial power, and the jurisdiction of the courts? See *Queen* v. *Keyn, supra*. Wheat. Int. Law, § 189, discusses this question, and, having shown that the jurisdiction of a state is exclusive over those portions of the sea which form the ports, harbors, bays, and mouths of rivers, says:

"It may, perhaps, be thought that these considerations do not apply with the same force to those portions of the sea which wash the coasts of any particular state within the distance of a marine league, or as far as a cannon-shot will reach from the shore. The physical power of exercising an exclusive property and jurisdiction, and of excluding the action of other nations, within these limits, exists to a certain degree. But the moral power may, perhaps, seem to extend no further than to exclude the action of other nations to the injury of the state by which this right is claimed."

In *Rex* v. *Forty-Nine Casks of Brandy*, 3 Hagg. Adm. 289, Sir JOHN NICHOLL says:

"As between nation and nation, the territorial right may, by a sort of tacit understanding, be extended to three miles; but that rests on different principles, namely, that their own subjects shall not be disturbed in their fishing, and particularly in their coasting trade, and communications between place and place, during war. They would be exposed to danger if hostilities were allowed to be carried on between belligerents nearer to the shore than three miles. But no person ever heard of a land jurisdiction of the body of a county which extended to three miles from the coast."

Judge HOPKINSON, in *U. S.* v. *Kessler*, Baldw. 35, says:

"The principle on which nations claim this extension of their authority and jurisdictional rights for a certain distance beyond their shores is to protect their safety, peace, and honor from invasion, disturbance, and insult. They will not have their strand made a theater of violence and bloodshed by contending belligerents. Some distance must be assumed. It varies by different jurists from one league to thirty, and, again, as far as a cannon will carry a ball. Such limits may be well enough for their object, but would be extraordinary boundaries of the judicial power and jurisdiction of a court of law."

Sir R. PHILLIMORE, in *Queen* v. *Keyn*, above quoted, sums up the whole matter:

"The *consensus* of civilized independent states has recognized a maritime extension of frontier to the distance of three miles from low-water mark, because such a frontier or belt of water is necessary for the defense and security of the adjacent state. It is for the attainment of these particular objects that a dominion has been granted over this portion of the high seas. This proposition is materially different from the proposition contended for, namely, that it is competent to a state to exercise within these waters the same rights of jurisdiction and property which appertain to it in respect to its lands and its ports."

In this court Judge BEE, in *Soult* v. *L'Africaine*, Bee, 207, discusses Act Cong. 1794, (1 St. at Large, 384,) as applying to a capture at Rattlesnake Shoals, very near the location of this ship, and four and one-half miles from the South Carolina shore. The act speaks of the capture of a ship or vessel within the jurisdiction or protection of the United States. He defines "jurisdiction" as relating to captures within the waters of the United States, about which there can be no dispute, and "protection" as applying to captures within the marine league. My conclusion is that the territorial limits within which civil process runs do not extend into this "frontier or belt of water" recognized by the law of nations.

Nor can we assume that the ship, not having cleared when she crossed the bar, was constructively present in the port of Charleston.

Nor can the statement of the master to the libelant, "If you have any claim against my vessel, libel her; there she is,"—give this court jurisdiction. The process was *in rem*, against the ship, to enforce a maritime lien. When we consider the paramount character of a maritime lien, and that a sale under it divests, not only the title of the owners, but the claim of all persons, we see how powerless the master, who represents the owner, is to create jurisdiction over the *res*. The thing itself

must be seized, must be within the jurisdiction, and must go into the lawful possession of the marshal. *The Rio Grande*, 23 Wall. 458; Hen. Adm. 356; Desty, Fed. Proc. 83; *The Commerce*, 1 Black, 581. No one can consent for it. There can be, in the very nature of things, no such thing as constructive presence within, and actual absence without, the jurisdiction. At all events, when the marshal passed the territorial boundary of the state he lost his official character, and could not exercise any official function. For similar reasons, the act of the master in stipulating for the ship cannot give the court jurisdiction which it did not have. *Railway Co.* v. *Swan,* 111 U. S. 379, 4 Sup. Ct. Rep. 510. But we have direct authority that the mere act of stipulating does not give jurisdiction. Hen. Adm. § 123; *The Fidelity*, 16 Blatchf. 569; *The Norma*, 32 Fed. Rep. 411.

The argument *ab inconvienti* has been pressed, and it affects me sensibly. But the jurisdiction of this court, and the territorial limits within which its process runs, are fixed by congress. The remedy is with congress alone. *Sheldon* v. *Sill*, 8 How. 441; *U. S.* v. *Railroad Co.*, 98 U. S. 603. The exception is sustained, and the libel dismissed for want of jurisdiction. The court can make no decree as to costs. *Railway Co.* v. *Swan*, 111 U. S. 387, 4 Sup. Ct. Rep. 510; *Doolittle* v. *Knobeloch*, 39 Fed. Rep. 40. Each party is responsible to the officers of the court for services required by them.