D. Sterrett Pindell, Plaintiff, *v.* Rockwood Holding Corporation, Jefferson Title and Mortgage Corporation and Others, Defendants.

Supreme Court, Nassau County, February 5, 1940.

*D. Sterrett Pindell,* plaintiff in person.

*William A. Davidson, County Attorney,* for the defendant County of Westchester.

*C. Elmer Spedick,* for the defendant Jefferson Title and Mortgage Corporation.

Hooley, J.   This is a motion (1) for an order vacating an order by an official referee of the Ninth Judicial District upon the ground that said order was made upon a mistake of fact and law and that the said referee has not lost jurisdiction in the action herein entitled " Action No. 1," and upon the further ground that the defendant Jefferson Title and Mortgage Corporation is without standing in court because of default in answering the " Second Amended Complaint;" (2) for an order staying all proceedings in " Action No. 2 " pending the completion of the trial and the determination of " Action No. 1."

Preliminary objection is made to the motion on jurisdictional grounds. It is claimed by one of the defendants (the other opposing defendant having waived the objection) that because the action herein has been brought in the Ninth Judicial District, the Supreme Court in Nassau county, which is in the Second Judicial District, has no jurisdiction.

The pertinent part of rule 63, which is the rule applicable herein, reads as follows:

" 1. A motion on notice in an action in the Supreme Court must be made within the judicial district in which the action is triable *or in a county adjoining the county in which it is triable.*"

It is conceded by all parties that the sole question to be determined herein on the matter of jurisdiction is whether or not Nassau and Westchester counties are adjoining counties.

Nassau county was erected in 1898 by chapter 588 of the Laws of 1898. No boundaries were set forth in the act other than to state that " All that territory now comprised within the limits of the towns of Oyster Bay, North Hempstead and Hempstead in the county of Queens is hereby set off from the county of Queens and is erected into the county of Nassau * * *." Therefore, the discussion which follows with respect to the boundary of the county of Queens applies to the county of Nassau which was once a part thereof.

Westchester and Queens counties were originally erected in 1683, by an act passed November 1, 1683 (1 Colonial Laws of New York [1664–1719], chap. 4, p. 121). That act was silent with respect to the waters in Long Island Sound. It provided as follows as to Queens and Westchester counties:

" The County of Westchester to contayn West and Eastchester Brox Land Fordham Annehooks Neck Richbells, Minfords Island, and all the land on the Maine to the Eastward of Manhatans Island as farre as the Government extends and the younkers land and Northward along Hudsons river as farr as the High Land. * * *

" Queens County to conteyne the severall towns of Newtowne, Jamaica, Flushing, Hempstead and Oysterbay, with the severall out farms, settlements and plantacons adjacent."

In 1768 the boundary lines of Queens and Westchester counties were extended so as to include the waters of Long Island Sound. (4 Colonial Laws of New York [1755–1769], chap. 1376, p. 1062.) That act provided in part: " Whereas there are many Islands lying and being in the Sound to the Eastward of Frogsneck and Northward of the Main Channel opposite to the County of West Chester, several of which are not included in any County in this

Province * * * Be it Enacted by his Excellency the Governor the Council and the General Assembly, and it is hereby Enacted by the Authority of the same, That all the Islands lying and being in the Sound to the Eastward of Frogsneck, *and to the Northward of the Main Channel*, and as far Eastward as Captain's Island including the same, *together with all that part of the Sound included within these boundaries*, shall be and remain in the County of West Chester; *And all the Southermost Part of the Sound from the Bounds aforesaid, as far as Queens County extends Eastward shall be and is hereby annexed to Queens County* * * *." (Italics supplied.)

If this were the final legislation on the subject it is clear that the boundary lines of Westchester and Nassau (then Queens) counties would be the main channel in Long Island Sound and that the counties would be contiguous.

However, after the Revolution the New York Legislature apparently deemed it necessary to re-erect the counties of the State and accordingly there was enacted chapter 63 of the Laws of 1788. As to Westchester and Queens counties, said statute provided as follows:

" The County of Queens to contain all that part of this State, bounded easterly by Suffolk County, southerly by the Atlantic Ocean, *northerly by the Sound*, and westerly by the west bounds of the township of Newtown and Jamaica, including Lloyds Neck or Queens Village and the islands called the Two Brothers and Hallets island, and all islands in the Sound opposite to the said bounds and southward of the main channel. * * *

" The county of West Chester to contain all that part of this State, *bounded southerly by the Sound*, easterly by the State of Connecticut, northerly * * *, and westerly by a line running from thence down the middle of Hudson's river until it comes opposite to the bounds of the State of New Jersey then west to the same, then southerly along the east bounds of the State of New Jersey, to the line of the county of New York, and then along the same easterly and southerly *to the Sound*, or east river, including Captain's Island, and all the islands in the Sound to the east of Frog's Neck and to the northward of the main channel." (Italics supplied.)

Chapter 64 of the Laws of 1788, which erected the towns in the various counties, bounded the towns in both Westchester county and Queens county which were adjacent to the Sound " by the Sound."

It is to be noted that the language in the above statutes is not as inclusive as the language in the Colonial statutes with respect to the waters in Long Island Sound. Having in mind that the

Legislature, in enacting the latter statutes, had before it the previous statutes, it would seem from a close reading of the statutes that it was not intended that the waters in Long Island Sound should be a part of either the county of Westchester or the county of Queens. This would seem to be supported by reference to the official Atlas of the State of New York, published in 1829, which set forth the boundaries of the two counties as follows:

" This County [Westchester] is situated on the east side of Hudson river, and adjoins the Sound. It lies between 40° 47′ and 41° 22′ north latitude, and 2° 57′ and 3° 27′ east longitude from the City of Washington. It is bounded northerly by the county of Putnam, easterly by the State of Connecticut, *southerly by Long Island sound* and the county of New-York, and westerly by the county of New-York and the Hudson river, which separate it from the State of New-Jersey and the county of Rockland. Its area is about 496 square miles, or 317,600 acres."

" Queens county is bounded *northerly by the East river and the Sound,* easterly by the county of Suffolk, southerly by the Atlantic Ocean, and westerly by the county of Kings." (Italics supplied.)

That this atlas purported to portray the accurate boundaries of the counties is evidenced by its frontispiece, which states as follows: " An atlas of the State of New-York containing a map of the State and of the Several Counties projected and drawn by a Uniform Scale from documents deposited in the Public offices of the State and other original and authentic information — under the superintendance and direction of Simeon DeWitt, Surveyor General, pursuant to an Act of the Legislature and also the physical geography of the State and of the several Counties and statistical tables of the same — Published in 1829."

Seemingly, the technical conclusion to be drawn, therefore, from a reading of the statutes erecting Queens and Westchester counties is that the waters of Long Island Sound adjacent thereto are not a portion thereof.

However, it is pertinent to view this question of jurisdiction and of boundary line apart from the statutes aforesaid.

In 1866 the Court of Appeals, in *Mahler* v. *Norwich and N. Y. Trans. Co.* (35 N. Y. 352), held that Long Island Sound was an inland arm of the sea and that each of the contiguous States had territorial dominion from its own shore to the middle of the sound, so far as their possession was coterminous; *the property of New York in the residue extending from shore to shore,* and the court cited laws (p. 360) which had been enacted from time to time covering, among others, such subjects as ferriage rights and regulation of fishing and navigation, to indicate that this State had exercised jurisdiction over such waters.

The history of the question of the jurisdiction over and title to the waters of Long Island Sound is a long and an interesting one. However, it is unnecessary here to more than relate that for over two hundred years there was a dispute between New York and Connecticut as to the title to such waters, more particularly those adjacent to the State of Connecticut. (Scharf, History of Westchester County, vol. 1, part 1, p. 3; Brodhead, History of the State of New York, vol. 2, p. 54; Report of the New York Commissioners [N. Y. Sen. Doc. (1880) No. 27] appointed to settle the disputed boundary lines with the State of Connecticut, pursuant to chapter 166, Laws of 1879; Bulletin of the United States Geological Survey, No. 171, p. 77; Op. Atty.-Gen. [1931] p. 156.) During all that period New York claimed all of Long Island Sound to the low-water mark of Connecticut.

Commissioners were appointed by both States from time to time in an attempt to settle the dispute, but it was not until 1879 that an agreement was reached after New York Commissioners were selected pursuant to chapter 166 of the Laws of 1879 to meet with Commissioners from the State of Connecticut. They agreed upon a line which had been surveyed and marked by a previous New York State Commission in 1860. That line started at the northwest corner of Connecticut, which point marked the corner of Massachusetts, New York and Connecticut, and ran substantially south until it reached a point near Byram's Point on the sound, from which point it ran substantially southeast to the *center of Long Island Sound*. Thence the line in the sound continued substantially through the center of the sound until it approached Fishers Island where it deflected northerly and then ran easterly through the channel between Fishers Island and the coast of Connecticut so as to include that island within the boundaries of New York State. That line is fully and accurately laid down in duplicate maps filed in the offices of the Secretaries of State of both New York and Connecticut. The boundary line agreement was approved by the Legislatures of both States and by act of Congress. (Conn. Special Acts and Resolutions No. 67, March 12, 1880; Laws of New York, 1880, chap. 213; 21 U. S. Stat. at Large, 351.) By section 2 of chapter 678 of the Laws of 1892 the boundary line between New York and Connecticut was set forth with more particularity and the ratification of the agreement of 1879 was continued in effect. The present statute setting forth the boundary line, section 2 of the State Law (Laws of 1909, chap. 59), is derived from the last-mentioned section.

Hence, it is clear that by agreement between the States, so far as we are concerned, the boundary line between New York and Connecticut in Long Island Sound is a line running from near Byram's Point to the center of the sound and thence along the center of the sound until it approaches Fishers Island, as aforesaid. (Op. Atty.-Gen. [1931] p. 156.) It would also seem to be clear that according to the agreement between the States, all the waters on one side of that line are in the State of Connecticut and all the waters on the other side are in the State of New York. As indicated by the maps, the waters on the New York State side are immediately adjacent to Westchester, Nassau (then Queens) and Suffolk counties.

Subsequently, by chapter 695 of the Laws of 1881, the boundary line of Queens and Suffolk counties was extended northerly into Long Island Sound. That statute provides in part as follows:

" § 1. The boundary line between the counties of Queens and Suffolk is hereby extended northwardly into Long Island Sound at a right angle to the general trend of the coast until it intersects the boundary line between the States of New York and Connecticut, as lately established by the Commissioners of the said States, and confirmed by the respective Legislatures thereof.

" § 2. The boundary lines of the several towns in the counties of Queens and Suffolk that adjoin Long Island Sound are hereby extended northwardly into Long Island Sound at right angles to the general trend of the coast at their several respective points, until they intersect the boundary line between the States of New York and Connecticut as lately established by the Commissioners of the said States, and confirmed by the respective Legislatures thereof.

" § 3. The jurisdiction of the legally constituted officers of Queens and Suffolk counties, and of the respective towns of said counties bordering on Long Island Sound, is hereby extended over the waters of said sound to the Connecticut State line."

It is interesting to note at this point that the original statute erecting Suffolk county (1 Colonial Laws of New York [1664–1719], chap. 4, p. 121) described it in precisely the same manner that Queens and Westchester counties were described, *i. e.*, by setting forth that it contained certain towns and naming them. Thereafter, when it was re-erected by chapter 63 of the Laws of 1788, it was described as bounded " northerly by the Sound " in the same manner that Queens county was described.

Therefore, we have the joint boundary line of Queens and Suffolk counties running to the New York-Connecticut line in the middle of Long Island Sound. An examination of the maps indicates

clearly that the lines intersect each other some distance easterly from the point where the New York-Connecticut line from near Byram's Point to the middle of Long Island Sound turns easterly along the mid-channel. It is also quite clear from the maps that *only a portion of Queens county, when extended* into the sound, intersects the New York-Connecticut line. That portion is a part of the town of Oyster Bay. *No portion of the town of North Hempstead,* when its boundary lines are extended, intersects such line. The question then arises: What happens to the Queens county line after it proceeds to the point in mid-channel where the New York-Connecticut line turns northward to Byram's Point? By the statute aforesaid, its entire boundary line was extended to the point where it intersects the New York-Connecticut line. But as heretofore pointed out, there is a considerable portion of the land in Queens county which, if lines were extended therefrom at right angles, would not intersect or touch said New York-Connecticut line. Seemingly, the only conclusion that can be reached is that said Queens county boundary continues westerly along the main channel along a line which would be a prolongation of the New York-Connecticut line. There would seem to be little doubt but that the Legislature intended that the boundaries of Queens and Suffolk counties should be extended to the main channel and it is quite obvious that overlooked the fact that a considerable portion of Queens county would not be 'adjacent to the Connecticut line when its boundaries were extended into Long Island Sound until they intersected said New York-Connecticut line. To conclude otherwise, it would be necessary to hold that only that portion of Queens county which intersected the New-York Connecticut line was extended into the sound and that as to the balance of Queens county its boundary continued to remain at the low-water mark. This would be unreasonable and untenable. Having determined, therefore, that Queens county (now Nassau) extends to the mid-channel of Long Island Sound, it becomes necessary to determine the situation with respect to the water on the other side (north) of the main channel.

We have already determined that all the water in Long Island Sound immediately west of the New York-Connecticut line from near Byram's Point to mid-channel *is part of New York State* by virtue of the agreement between the States. That part of the State which is adjacent to this water is Westchester county. There can be no question that all of New York State is embraced within the confines of some county. (*Manley* v. *People,* 7 N. Y. 295, 298.) Accordingly, that portion of Long Island Sound must be held to be a portion of Westchester county. No other possible conclusion can be drawn.

The court decides, therefore, that Westchester county and Nassau county are adjoining counties, and, this being the case, the motion herein is properly made in Nassau county.

However, the motion must be denied on the merits as the action is no longer properly before the referee. On March 23, 1938, the official referee granted the motion of Jefferson Title & Mortgage Corporation that the case be sent back to the Trial Term. From a reading of the papers it would appear that this was undoubtedly done because of the claim of that defendant that a question of title was raised in the answer of some of the defendants and that, therefore, said defendant was entitled to a jury trial pursuant to section 504 of the Real Property Law. Apparently the referee felt that the claim of title in the answers resulted in a change of position with respect to said defendant and that it was entitled to be relieved of the stipulation that it had theretofore signed referring the matter to said referee to hear and determine. All of the foregoing was before the Special Term of Westchester county when the motion that the trial before the referee be continued was denied by order entered May 17, 1938. Subsequently, on the return day of a notice of hearing, returnable October 31, 1938, before the official referee, he again declined to proceed with the matter on the ground that he no longer had jurisdiction. Thereafter, on November 22, 1938, the plaintiff moved to vacate the order of May seventeenth. He pointed out in his moving papers that the referee seemed to think that the said order had beclouded his jurisdiction " and that it might be dangerous to proceed with this order standing on record." It is apparent that the question of jurisdiction was squarely before the Special Term on the motion made at Special Term and on the subsequent motion to vacate same. This court cannot act as an appellate court herein. If the plaintiff felt aggrieved by the decisions on the prior motions, he should have appealed. In effect, he is seeking to achieve the same result by this motion.

The claim that Jefferson Title & Mortgage Corporation is in default with respect to serving an answer to the second amended complaint is without merit. Said defendant's answering affidavit contains a full and complete answer to said contentions.

The second part of the motion, which is an application to stay all proceedings in " Action No. 2," is denied. Action No. 2 is a separate and different action and any application in connection with that action should be made in that action. Settle order on notice.